NEW YORK CONTINENTAL JEWELL FILTRATION CO. v. CITY OF HARRISBURG.

(District Court, M. D. Pennsylvania. August 25, 1913.)

No. 43.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FILTRATION PROCESS AND APPARATUS.

    The Jewell Patents No. 644,137, and reissue No. 11,672, respectively, for a process and apparatus for filtration of water, consisting of the use of a new type of sand filter known as the down draft or negative head filter, which by creating a vacuum through the use of a vertical discharge pipe in the bottom utilizes the whole sand bed as a filtering agency, whereas the sediment layer forming on its surface had previously been the only effective agency, were not anticipated and disclose a useful and novel invention; also *held* infringed.

In Equity. Suit by the New York Continental Jewell Filtration Company against the City of Harrisburg, for infringement of letters patent No. 644,137, for a method of purifying water, granted to Omar H. Jewell, February 27, 1900, and reissue No. 11,672, for improvement in filters, granted to the same patentee June 28, 1898. On final hearing. Decree for complainant.

James I. Kay and Kay & Totten, all of Pittsburgh, Pa., and W. B. Anderson, of New York City, for plaintiff.

Daniel S. Seitz and M. W. Jacobs, both of Harrisburg, Pa., for defendant.

BUFFINGTON, Circuit Judge. In this case the New York Continental Jewell Filtration Company charges the city of Harrisburg with infringing two of its patents in the operation of that city's municipal water filtration plant. As the patents concern such public uses, the case is one of widespread municipal importance. The large sand bed through which the confined water seeps or percolates gives to such plants the name of "sand-filtration." At the base of such bed the purified water passes into draining channels, and is carried to the filter

outlet. Over these channels are graded layers, beginning with those of large stone and followed by those of gravel or coarse sand. On top of these lies the fine sand bed which gives the plant its name. The usual practice is to run the raw or unfiltered water into a sediment basin, where the coarser suspended matter settles. The partially clarified water then goes to a filter basin and lies, to the depth of several feet, on the sand bed. The constant head of water, weighing as it does many tons to the acre area, which is the usual size of the basins, exerts a forcing, percolating pressure, and gives to such filters the name of "positive head" or "gravity" filters. In them the effective filtering or purifying agent is a sediment layer or mud crust, which gradually gathers on top of the sand and forms a complete and unbroken scum or cover. This layer, well recognized everywhere as the vital factor in filtration, is usually known as the "Schmutz-Decke," German words, meaning, literally, "the dirty covering." The formation thereof and the general operation of filtering are thus described in the respective briefs. That of the plaintiff says:

"When a slow-sand filter is first started, the outlet valves are so set as to allow the water to percolate slowly through the bed, say at about one-tenth the normal rate of filtration, and each day thereafter the rate is progressively increased so that at the end of a few days it is running at the normal rate of speed, and so maintained, this being necessary to insure proper building up of the sediment layer or Schmutz-Decke. In a month or so this sediment layer accumulates on the surface of the filter, and becomes so thick as to practically prevent the passage of water through it, and then the filter has to be shut down and drained; and it is cleaned by manually scraping off, with shovels, from half an inch to an inch or more of the surface material. The filter is then again filled with filtered water, applied from below the bed, the raw water turned on, and filtration resumed, at slow rate at first and gradually increasing this rate as before."

From these workings it will be seen the process requires the maintenance of a deep head; it involves the gradual building up of the surface layer; it necessitates frequent stoppages of filtration, washing, and subsequent upbuilding of the layer; such washings require the use of filtered water. The account in defendant's brief reads:

"In slow-sand filters, after they have been in operation a little time, there is an accumulation upon the surface, including certain helpful bacteria, the growth of which form gelatinous sticky coatings on the sand grains and tend to reduce the pore spaces between the grains and thus intercept the impurities suspended in the water, and further bring about the oxidation and nitrification of the organic matter dissolved in the water, to a large extent, and thus purify the water to a high degree without the addition of chemicals.

"In the operation of mechanical filters the water is passed through the filter bed so rapidly that there is not sufficient time for the bacterial growths to develop in the top layers of the sand, as above described for slow-sand filters, and it is necessary to produce an artificial gelatinous clogging of the top of the filter to take the place of the bacterial jelly formed in slow filters. This is done by adding to the water certain chemicals, like sulphate of alumina or sulphate of iron, which have the property of becoming insoluble in the presence of alkaline constituents like the carbonates of lime and magnesia, which are found in most natural waters, or can be cheaply added if the water be naturally deficient thereof. When solutions of iron or aluminum sulphate are added to waters having an alkaline reaction, therefore, the soluble sulphates of iron or alumina are chemically changed into the insoluble hydrate, or hydrated oxide, which gradually appears in the water in the form of a floccu-

lence, scattered throughout the entire mass to which the chemicals may have been added, and catches in its flakes many of the particles of impurities suspended in the water. When water which has been treated in this way is passed upon filters, and goes down through the sand bed, the flocculent particles produced by the chemical reactions are caught in the filter bed and retained there, the clarified water passing on down through the bed and issuing through the outlet pipe and controller. The flocculent matter, or coagulum, which has been retained in the filter bed is like the bacterial jelly in the slow filters, gelatinous and sticky in its nature, and serves to reduce the pore-space between the sand and thus intercept and hold back the suspended matters in the water being filtered. After about 12 to 20 hours (on the average) of operation, rapid filters generally become clogged so that they will not yield their rated quota of water, and then it becomes necessary to clean them."

It would thus seem that in slow-filtration plants, the efficient agent of filtration is the surface sediment layer. Where more rapid or mechanical filtration was necessary, coagulants were used, and what corresponded to the Schmutz-Decke was by them formed in a few minutes, the coagulants forcing the impurities together like curd in milk. The proofs, as will be seen in extracts quoted below, show that this surface sediment layer usually is found in a stratified zone, distinct from the sand bed beneath, and that there is little, if any, penetration of the gelatinous sediment matter into the latter. It also appears from such proofs that as the surface sediment layer thickened, it was so compacted by the water head pressing on it that little water passed through it. But not only did such surface layer tend to eventually prevent percolation, but its compact shell tended to create a vacuum beneath, which latter, by liberating the air in the passing water, still further impeded percolation. This arose from the fact that water, under high pressure, retains very considerable air, which, as a vacuum is formed and the water is subjected to less pressure, is released. But this released air tends to fill and clog the interstices between the sand grains and thereby clogs the water flow. In that regard, the Fuller report, made prior to this suit, in the Cincinnati filtration tests, is illuminative. There Mr. Fuller, who was subsequently accredited by the defendant in making him its witness, in speaking of slow-sand, or English, filters, then said:

"In English filters the section of maximum frictional resistance is always at and just below the surface of the sand layer. Accordingly, when the active head exceeds the depth of the water above the sand, there is a *united clogging action at this portion of the filter*, due both to suspended matter removed from the water and the air evolved from it. As a result of this confined action, the yield of water after this time is very small."

The views of Mr. Hazen, who had wide experience in filtration and was in charge of the experimental plant maintained by the commonwealth of Massachusetts at Lawrence, agree with Mr. Fuller's. In Hazen's book, Filtration of Public Water Supplies, 1895, referred to by him when called as a witness by defendant, speaking of the Lawrence experimental plants, it is said:

"It is also customary to have a depth of water on the filter in excess of the maximum loss of head, so that there never can be a suction in the sand below the sediment layer. * * * The suction only commences to exist as the increasing head becomes greater than depth of the water, and there is no way in which air from the outside can get in to relieve it. In these ex-

perimental filters in winter, when the water is completely saturated with air, a small part of the air comes out of the water just as it passes the sediment layer and gets into the reduced pressure, and this air prevents the satisfactory operation of the filters."

It will therefore appear that in the gravity or positive head plants of the slow-sand filtration art the sediment surface layer of "Schmutz-Decke" was the effective agent and the substantially sole place where filtration occurred; that it so compacted that there was little gelatinous penetration below it; that the vacuum caused by the compacted surface layer, by releasing the water-carried air, clogged the sand interstice passages and further retarded flow of the water. Without entering into details we here further note that the proofs also show that this vacuum-liberated air, owing to the slow and retarded passage of the water, was not carried off, but at times bubbled upward and ruptured the Schmutz-Decke. This rupture allowed unfiltered water to pass into the sand bed until by its impurities such passing fluid gradually closed up the ruptured layer and restored the Schmutz-Decke to a state of filtering efficiency.

In this state of the art; with the slow formation of the surface sediment layer; with that layer constituting virtually the sole potent factor of filtration; with the sand bed's being practically confined to forming the surface sediment shell; with vacuum regarded as a retarder of filtration, and tending to lessen plant output—the patents here in question entered the art. In that art, as we have seen, the only water-impelling force utilized came from gravity, as stated by one of defendant's witnesses, who said:

"In case of positive filters the water passes through the filter by virtue of its own weight and the pressure of the superincumbent water above the sand surface."

To that art, which regarded vacuum as an evil, Jewell in his process disclosed the radical and revolutionary suggestion that this vacuum, if of such relative completeness as to utilize its efficiency, could be made, not only to avoid all troubles incident to air-releasing, but to utilize the whole sand bed as an active efficient filtering agency. In other words, he claimed by the proper use of vacuum, to virtually convert the entire sand body into a quasi Schmutz-Decke. The process, means, and object disclosed are aptly set forth in his specifications, as follows:

"My invention relates to purifying waters for potable purposes by filtering such waters through granular filters. As is well known, the principal object of filtering the water supply of towns and cities is to remove the suspended impurities, which in many instances are in a finely divided state, and experience has proven that granular filters—that is to say, filters in which the water is caused to percolate through a filter bed composed of loose sand or other granular material—furnish a filtering medium which is best adapted for removing the suspended impurities, while permitting the water to flow at a rapid rate, as is necessary where the water supply of a town or city is being filtered. In using granular filters heretofore, however, it has been found that in most instances a granular filter bed will not intercept and retain the suspended matter in its normal condition, and it has therefore been found necessary, in almost all instances, to introduce a coagulant, such as alum, into the water before filtration, the coagulant serving to coagulate the sus-

pended matter into masses which are larger and more susceptible to interception and retention by the granular particles composing the filter bed, in some instances it being necessary to use such a large quantity of alum as to affect the taste of the filtered water.

"My present invention consists of an improved process of purifying water by filtration through a granular filter bed, by which the necessity of the use of alum or other coagulant is in many cases entirely avoided, and in other instances, where the impurities are in an exceptionally finely divided state, the quantity of alum which under former processes would be necessary is very greatly reduced.

"To this end my invention consists in effecting what may be termed the 'Coagulation' of the suspended impurities of the water by suction while passing through the filter bed; the particles of suspended matter being thereby caused to come together into masses of sufficient size and of such character as to be readily intercepted and retained by the granules composing the filter bed.

"My invention further consists in applying the suction principally at the lower portion of the filter bed, so that it acts more strongly upon the finer particles of suspended matter which have passed through the upper portion of the filter bed,

"My invention further includes the compacting of the filter bed in such manner that the lower portion thereof will be of the greatest density, the density gradually decreasing towards its upper surface, as by this means, while the larger masses of impurities will be retained by the more widely separated granules at the upper portion of the bed, the lower portion of the bed will be sufficiently dense and compact to intercept the smaller particles of suspended matter, especially after they have been coagulated, as above stated.

"In the accompanying drawings I have shown apparatus designed to utilize my improved process, such apparatus in general consisting of a filter bed of loose granular material contained in a suitable receptacle and a pure-water pipe in the bottom of said receptacle, said pipe being provided with suitable strainers to prevent the granular material from entering such pipe and with an off-carrying pipe vertically arranged and of such length that as the filtered water is carried off by said pipe, a partial vacuum will be created within the filter bed, the vacuum being greatest in the lower portion of the bed and gradually diminishing toward the upper surface thereof. By this means a continuous suction is exerted which is greatest in the lower portion of the bed, compacting it so that its density will be greatest at the bottom, and will gradually diminish toward the upper surface thereof. Furthermore, the suction causes the air contained in the water in the filter to separate and concentrates it, the minute bubbles coming together, forming larger bodies of air, which are, to a great extent retained within the filter bed. As the fine air-bubbles converge they act to concentrate and coagulate the particles of suspended matter, so that finally the suspended matter is formed into larger bodies, which may easily be intercepted and retained by the filtering material. As the process of filtration continues, the air extracted from the water gradually accumulates in the bed, still further compacting it and increasing the efficiency of the filter to such an extent that, even though the bed contain large quantities of impure matter extracted from the water, the filter may nevertheless be continued in use with satisfactory results, thus making it unnecessary to wash the bed as frequently as has been necessary with other forms of filters employing granular filter beds."

The practical outcome of Jewell's process has been to create in sand filtration, a new, distinctly recognized and differential type of plant known as the down-draft or negative head filter. It is bottomed on a designedly created vacuum, which in the words of the extracts quoted results from "an off-carrying pipe vertically arranted and of such length that as the filtered water is carried off by said pipe, a partial vacuum will be created within the filter bed." And "it extends.

downward a sufficient distance to provide the necessary down-draft, usually several feet." Its action as stated, is that "the entire body of filtering material is utilized instead of substantially the upper surface only, as in prior construction." These extracts clearly show that from the patentee's viewpoint, the gist of his invention was the utilization of the whole sand bed as a filtering agency, and this he meant to secure by the designated creation of an impelling vacuum. While there are views and contentions to the contrary in this voluminous record, every part of which has had our thoughtful examination, we are constrained by the fair weight of the evidence to find, as we do, that the process and apparatus disclosed by Jewell in his patent here involved do in practical use, by the creation of a vacuum, utilize the whole sand body as a filtering agency as it was never used before. Indeed, that the workings of a down-draft or negative head filter must, in the nature of things, be different from a gravity or positive head filter is self-evident, from the fact of its calling into play the powerful agency of atmospheric pressure. From this we can readily understand that such atmospheric force, whether venting itself as a weight from above or a suction from below, must cause new results in a process, the basic element of which is the pressure passage of liquid through impeding matter. On the surface, Jewell's change seems slight; in fact the mere adding of a water-sealed, vertical off-take pipe. In substance and practical worth it has evidently added to the filtration art a factor, and proven so important as to warrant the expenditure, by the defendant and its associated cities, of the time, labor, and expense involved in this large record. Were the contention that this vertical off-take worked no substantial change from gravity filters, it would very likely have been abandoned. On the other hand, the continued use thereof tends to support the contention of plaintiff's witnesses that the change effected thereby is substantial and valuable. Just how the vacuum produces the results we shall see it does produce is by no means clear. Its workings are hidden from view in the sand mass, and there seems, at present, no way of observing, testing, or determining the phenomena incident thereto. It is a fact, as seen in the extracts quoted above from the specifications, that Jewell volunteered certain explanations, but it is evident that in the nature of things they were speculative, for the expert, who plaintiff's counsel say is an authority on water action, after discussing all the elements that might contribute thereto, frankly says:

"All the causes taken together would seem insufficient to give the advantageous result in the matter of the length of the run which has been shown. In other words, I don't see why the results are as advantageous as they are."

That in point of fact they are useful and novel is shown, as we have said, by the weight of the proofs. Referring to same, we may say that the witness Leopold, who is a practical filtration man and has taken part in the construction of sixty municipal and many other plants, says:

"The blanket of Schmutz-Decke of a positive head filter is usually more dense and more of a distinct separate coating supported on the surface of the sand than is the blanket of a negative head filter, and can be often completely

separated without displacing or taking up any appreciable amount of the sand grains. That of a negative head filter will be combined with the surface sand, and the evidence of it can be found penetrating the sand bed to a considerable depth. * * * I have found evidence of penetration, I would judge, apparently 18 inches in the sand bed, without affecting the efficiency or clarification of the water. * * * My conclusion is that the suction created by the velocity of the water in the negative head tube, exerting the pull first at the bottom of the bed, draws the sand grains and rearranges them ·at the bottom, drawing them tighter together, and this naturally rearranges them at a strata a little higher up, this gradually continuing upward in the bed. The penetration of the upper strata of the sand bed is conclusive evidence of this to my mind."

The witness Roberts who is also engaged in practical filtration work and has taken part in the construction of some forty plants, says:

"I found with a positive head filter that if we would run the water off the filter in a given direction and let the surface of the sand become dry, the accumulations would crack and curl up and find the sand immediately under this blanket, or mass of accumulation, practically clean. On the other hand, I found in the down-draft filters that we would have a decided penetration of the dirt or impurities into the sand. I have also found that increasing or decreasing would produce different results: By increasing the length of the tube we would get a longer flow. * * * In so far as the results of the tests relative to the two types of filters, we found that we could accumulate within the filtering material more of the matter taken out of the water in the negative head than we could in the positive head. In examining the beds we found that it penetrated deeper. We also found that at times it not only penetrated the bed, but would come through into the filtered water."

The witness Johnson, whose practice in filtration engineering has been extensive both here and abroad, testifies to the difference in results effected by the Jewell process:

"The suction acts upon the bed to draw water through the same, and as the sediment layer forms on the upper surface of the sand layer the suction acts to draw the impurities down into the bed, sloughing off or eating away the under portion of the sediment layer and carrying the impurities down into the bed, thereby preventing the sediment layer from becoming so thick as to choke the filter, and allowing of the extension of the 'run' between washings and increasing the yield of the filter bed. * * * The weight of the column of water descending in the suction or down-draft pipe causes the production of a larger output of properly filtered water, and the sediment separated from the water during filtration is carried further down into the bed by the weight and velocity of the descending column of water below the bed, which force acts, as the upper portion of the bed becomes choked with sediment, to draw portions of such sediment layer downwardly into the bed, the upper portion of the bed being maintained in looser condition than it is in a positive head filter, and so allowing the free entrance of the suspended matters, and the lower portion of the bed being more compacted than the upper portion, as before stated, and so tend to retain such impurities within the bed."

This witness gives a specific instance of such results with data based on observations made at the plant at Little Falls, N. J., which, when studied—but which we will not detail—to our mind warrant his conclusions. The testimony of plaintiff's witness Caird also carries conviction. He had charge for the city of the municipal filtration plant at Middletown, N. Y. Without entering into particulars, it suffices to say that it very clearly establishes the fact that the operation of

the plant was very materially changed to an increased output and lengthened runs by the addition of a vertical off-take outlet. The same witness, who also had charge of a like plant for the city of Bangor, Me., testifies that the efficiency of its gravity plant was strikingly increased, both in the amount and character of filtered water, by reason of the use of Jewell's process. The difference between the penetration observed in gravity and down-draft filters is also testified to by the witness Ryan, an experienced filtration engineer. When asked as to his observations in testing plants, in which branch his work was of very considerable extent, he says:

"In the case of positive head filters, the sediment layer is usually much thicker than in the case of a negative head filter. Also in the case of a negative head filter I have usually found that it usually penetrates into the bed, which is not the case with a positive head filter. * * * In some cases (of a positive head filter) I have seen this sediment of such a character that it could be scraped off the top, leaving the sand below practically clean. * * * The negative head filter has the layer on the surface of the sand much thinner, and if the sand is examined at considerable depth below the surface, say to 16 inches, usually there will be found some of the coagulated matter, not 24 inches under the surface, but actually coming through the effluent pipes of the negative head filter"

—a fact also observed, as we have quoted above, by the witness Roberts. Without referring further to the numerous witnesses called, or discussing the many other questions involved or raised by witnesses in general, we restrict ourselves to stating that our study of the case satisfies us that Jewell's process does, by the use of a down-draft, sealed, vertical outlet pipe, create and maintain an operative vacuum, which vacuum effects a deeper utilization of the sand body for filtration than in positive head filters; that the presence of released air incident to the use of a down-draft vacuum is helpful and not harmful by reason of the velocity imparted to the passing water by such vacuum; that the process makes the runs longer, and both structural and maintenance costs are lessened by its use. Indeed, that vacuum draft increases run lengths is, we understand, conceded by defendant, the only question being the amount. Thus Hazen, its witness says:

"I have studied the use of draft tubes; I have designed and built filters having draft tubes, and have noticed the results of filtering when the draft tube is operated and when it is not operated. I think I understand the condition fully. The effect of the draft tube is practically to increase the length of run by a percentage that is not very large, but is still worth securing."

So in defendant's brief the statement is made that:

"A review of the entire testimony shows that the only advantage derived from the addition of a trapped down-draft pipe to a filter is that it gives additional available head, and hence prolongs the run of the filter between washings."

We next turn to the question whether Jewell's disclosure involved invention. That it was an original conception as contrasted with an obvious expedient is clear, for even now that its working efficiency has been shown, no one can yet explain how it works, or why it should produce the results it does. His disclosure was not the mere material suggestion of the use of a down-draft tube to create a vacuum.

The originality and substance of his disclosure was in the utilization of a vacuum. His apparatus was simply the concrete means suggested to utilize the process. This disclosure was a marked departure from the previous ideas and practice. It gave to the whole of the large sand body of the art a compacted, sustained, functional, working capacity it did not previously have; it created a new type of filter in the art; the process has gone into widespread and extensive use. We are therefore of opinion that Jewell's disclosure involved invention, and that his general process claim, viz.:

"The method of purifying water which consists in passing the impure water through a granular filter bed having an exposed filtering surface, and at the same time applying suction from below substantially as described"

—and the modifications thereof embodied in his other claims, should be sustained. Nor do we think the merit of his disclosure, or the substantial reward of a patent, should be denied him by reason of anything that preceded him in filtration practice, theory, or patent. That the existence of a vacuum in filtration experiments was observed and commented upon prior to Jewell may, for present purposes, be assumed. His merit consisted in pointing out that an objectionable vacuum could, if properly used, be made to cause deeper penetration, with the substantial benefits incident thereto. For example, the presence of a vacuum from time to time in filtration was observed, and attention was directed thereto in the experiments at Lawrence. We assume for present purposes, but without so deciding, that the references thereto in Hazen's book were prior to Jewell's. But these facts only serve to emphasize the original and valuable character of Jewell's subsequent disclosure. For it is clear that with the attention of this scientific experimental staff drawn to the subject, with such information presumably imparted to the many engineers and scientists engaged in the subject of filtration, no one was led thereby to discover that a vacuum could be used to deepen penetration. Indeed, as showing the then total lack of appreciation of the dormant and undiscovered capacity of a down-draft vacuum to increase run lengths, and that vacuum was regarded as a mere negligible, occasional, undesigned, and objectionable feature, we may refer to the testimony of the witness Hazen, who says:

"I have already described how the negative head occurred in some of the experimental filters at Lawrence. The negative head occurred without any special design or intention, although its occurrence was noted, and its practical significance more or less thoroughly understood. * * * How frequently it occurred and how large an element it was in producing the results cannot be now determined."

That in point of fact such down-draft was then regarded as objectionable, and that means were taken, by increasing the gravity head, to avoid it is, we think, clearly shown in Hazen's work, Filtration of Public Water Supplies, already quoted:

"It is also customary to have a depth of water on the filter in excess of the maximum loss of head, so that there can never be a suction in the sand just below the sediment layer. * * * The suction only commences to exist as the increasing head becomes greater than the depth of the water, and

there is no way in which air from the outside can get in to reduce it. In these experimental filters in winter, when the water is completely saturated with air, a small part of the air comes out of the water just as it passes the sediment layer and gets into reduced pressure, and *this air prevents the satisfactory operation of the filters.*"

From this it is clear that regarding the Lawrence Experimental Station, as we are justified in doing, as evidencing the most progressive views of the filtration art, it would seem that vacuum was regarded as objectionable. The aim was to exclude, not to utilize, it. Had the art maintained its then attitude toward vacuum—filtration's most valuable and most misunderstood servant—there would have been no evolution of down-draft filtration. Indeed, to our mind, these Lawrence observations of vacuum are strong proofs of originality in Jewell's work. When it is borne in mind that filtration was then a subject of general study and vital interest; that an earnest body of sanitary engineers, scientists, and municipal officers were devoting themselves to its problems; when its processes were being made the specialized study of a state experimental plant—for a patentee to take up a feature, which while known, was deemed objectionable, and show that such feature could be made a serviceable and important element of filtration, justifies a court in sustaining the patent the office gave him. For assuredly a court, in the light of the practical results in the working of the process, has a much stronger case before it than the Patent Office had when Jewell's process was comparatively theoretical. We have therefore reached the conclusion that Jewell's process was useful, novel, and inventive, and that the claims thereof should be sustained unless anticipated. As usual in such cases, a large number of publications, uses, and patents are cited which it is alleged should establish anticipation. That they did not is clear. All of such data were within the range of knowledge of acute men who were working to improve the art. The public demand was for effective and sufficient filtration. Manifestly, men of presumably much deeper and broader scientific ability than Jewell were studying the subject, yet none of these men were led by this wealth of alleged anticipation to utilize vacuum.

At the argument, and in reply to an inquiry by the court, counsel for defendant cited the British Patent of Neville, No. 6,160, of 1831, as the nearest approach to Jewell. This patent was considered by the office in the progress of Jewell's application. By his disclaimer and the limitation of his claims, Jewell recognizes Neville's patent, but beyond that the office gave it no effect as an anticipation. In our view this was right. While the two patents concern the general subject of filtration, and while, as Professor Langley, one of the defendant's witnesses aptly expresses it, Neville clearly apprehended "the use of a down-draft tube and the physics of its operation," it is also clear that the problems before the two men were not the same. They were using the vacuum for wholly different purposes in filtration, and the device of Neville threw no light on Jewell's work. As we have seen, the latter's problem concerned the loose, uncovered, sand beds of modern filtration, with their Schmutz-Decke

or sediment layer. That art and its difficulties and problems only came into existence long after Neville's time and the necessity for filtration, rapid and on a large scale, within the last few years. Jewell's problem was how to vitalize and utilize the whole sand bed in filtration. The gist of his problem was how to do this, and his solution of the problem was the use of a vacuum to so vitalize and utilize the whole sand body. Neville had no such problem before him. His patent did not disclose either the fact that a loose sand bed could be vitalized and utilized, nor did it show how it could be done. Neville was dealing with filtration not through an automatically formed sediment layer which he wished to deepen, but with an already formed, artificial layer of felt, cleansed as the sediment formed, and which was the efficient and active factor in filtering. His felt blanket in and of itself served the double functional purpose of being an already formed surface filtration layer, as well as a further gathering agency. The mass of powdered or ground charcoal below the felt was rammed as tight as possible, was protected from displacement, and to all functional intent was a porous solid body. The question of deeper penetration was not involved in the object he had in view. Indeed, the success of his device, if, in fact, it was successful, evidently centered on substantially the whole of the filtering being done by the felt cover, for he made no provision for cleansing the rammed substratum. It would seem, therefore, that deeper gelatinous penetration was to be avoided. It is therefore clear that Neville threw no helpful light on the problem of deeper penetration, which Jewell solved more than half a century later. It should be borne in mind, also, that Jewell's device was not only scientifically meritorious, and a patent therefore a just and earned reward to an inventor of more than an ordinary desert, but that in the field of altruistic and humane work he made a substantial contribution to the advancement of public health and welfare. The reasoning applicable to his process patent warrants a decree in the apparatus patent in which he discovered how his process could be utilized. On the subject of infringement little need be said. That defendant's plant has a down-draft, sealed suction apparatus, a loose, granular, exposed surface filter bed, and that it operates by the patented process is established by the weight of the evidence. Indeed, the plant is seemingly based on and patterned after the Little Falls one, to which we have referred.

A decree may be prepared in accordance with these views.